IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>                    Plaintiff,<br><br>          vs.<br><br>Matthew Scott Carlill,<br><br>                    Defendant. | CR15-1161-TUC-CKJ(JR)<br><br>**REPORT AND RECOMMENDATION** |

On July 9, 2015, Defendant filed a Motion to Suppress Post-Arrest Statement-Involuntariness (Doc. 13) and a Motion to Suppress Post-Arrest Statement-Illegal Arrest (Doc. 14).  The government filed responses to both motions on August 10, 2015 (Docs. 26 and 27). The matter was heard by Magistrate Judge Rateau on November 16, 2015 (Doc. 38).  Defendant was present and represented by counsel.  The government presented four witnesses and the Defendant testified at the hearing.  (Doc. 39).  Five exhibits were admitted at the hearing (Doc. 40).   Having considered the matter, the Magistrate Judge submits the following Findings of Fact and Conclusions of Law and recommends that Defendant's Motion to Suppress Statements be denied.[1]

---

[1]Trial is currently scheduled for February 23, 2015 and a plea deadline has been set for February 5, 2015.  Doc. 43.

## I.   FINDINGS OF FACT

### A.   Government Witnesses

The Lukeville, Arizona port of entry into the United States from Mexico is a small facility located about 40 miles south of Ajo, Arizona.  TR at 16.[2]  On May 31, 2015, Customs and Border Protection Officer Christie Keener was the primary officer at the Lukeville port of entry and was working in the vehicle primary booth where she was in charge of inspecting vehicles before they would be allowed to enter into the United States.  TR at 55-56.  When a vehicle approaches the booth, the primary officer will take a standard customs declaration for fruits, plants, meats, vegetables, alcohol, tobacco, firearms, drugs, medicine and narcotics.  TR at 56.  Also, if an immigration status is in question, the officer will inquire about that status.  TR at 56.  The booths are also equipped with computers and plate reader cameras that enable the officer to retrieve the registration information, including the owner's name and address, for vehicles and trailers as they approach the booth.  TR at 56-57.

While Officer Keener was working in the booth on May 31, 2015, a truck towing a trailer approached.  TR at 57.  The plate reader system indicated that Defendant Matthew Carlill was the owner of both the truck and the trailer.  TR at 59.  After Carlill stopped at the booth, Officer Keener asked him how he was doing and confirmed he was the registered owner of the truck and trailer.  TR at 57-58, 62; 87-88.  She then asked what was in the trailer and Carlill told her there were two RVs and a jug of water.  TR at 58.

---

[2] TR refers to the transcript of the November 16, 2015 hearing.

Carlill told Officer Keener that his passenger was his wife and that they had been to Rocky Point, Mexico, for a one-day honeymoon.  RT at 63.  Carlill's explanation was similar to that Officer Keener had heard in another drug case in which she was involved.  RT at 63.  The officer also noted that Carlill was "shaking slightly with his hands," and had rapid eye movements, and that his passenger "also exhibited signs of fast responses, looking away."  TR at 63.  Those considerations, along with the fact that there are "a lot of trailer loads at the port," caused Officer Keener to refer the truck and trailer to secondary, where Carlill and his passenger would be subject to further questioning and the truck and trailer would be subject to further inspection.  TR at 63-64, 66.

Once in secondary, Carlill and his passenger were met by United States Customs and Border Protection Officer Jacob Torres.  TR at 65-66.  Officer Torres, who was assigned to K-9 and secondary duties, asked Carlill and his passenger where they were coming from and where they were headed to.  TR at 67.  They said they had been in Rocky Point and were returning to Phoenix after their honeymoon.  TR 67-68.  Carlill again confirmed his ownership of the truck and trailer and told Officer Torres that there were "two quads that he was haling inside the trailer that were his, as well."  TR at 69.

Officer Torres then escorted Carlill and his passenger to a holding area and proceeded to inspect the vehicles.  TR at 69.  The officer initially ran his K-9 and got a positive alert toward the front of the trailer.  TR at 71-72.  He then used a density meter and again found abnormal readings on the front of the trailer.  TR at 71-72.  He then X-rayed the vehicle and found anomalies in the same two areas where the density meter had and where the K-9 had alerted. TR at 72.  At that point, the trailer was taken apart and

marijuana was found inside a false wall in the front of the trailer.  TR at 69-70, 72. Carlill was then placed under arrest.  TR at 69-70.

At about 6:00 p.m., the officers at the border called Homeland Security Investigations ("HSI") Special Agent Sean Loose, who was the HSI agent on call, and explained the situation.  TR at 17-18.  Based on the information he received, Agent Loose, who was in Tucson at the time, decided to travel to Lukeville to investigate further.  TR at 17.  As Agent Loose was traveling from Tucson to Lukeville, a trip of approximately three hours, he was notified that another smuggling incident, this one involving three persons, had occurred in Lukeville.  TR at 17-18.  Thus, when he arrived in Lukeville at about 9:00 p.m., he had five individuals he needed to interview: Carlill and his passenger from the first incident, and the three from the later incident.  TR at 18.

When he initially arrived in Lukeville, Agent Loose inspected Carlill's truck and trailer and then proceeded to speak to the officers involved in both the primary and secondary inspection, including those that ran the scanning equipment.  TR at 18-19. When Agent Loose first encountered Carlill, he was in a holding cell located at the north end of the facility building.  TR at 19.  Agent Loose described the cell as "a large, slab block room, with a bench in it and a toilet facility, . . . I would say it's probably 20 feet long by 10 feet wide. . . [with a] bench for an individual to sit or lay on."  TR at 19-20; Ex. 4 (photo of holding cell).  Agent Loose asked Carlill how he was doing and, other than complain about the temperature of the building and mention that he was tired, he said he was fine.  TR at 21, 32.  Carlill then asked why he was being held, and Agent Loose told him it was so he could speak to him later, "if he so elected."  TR at 23.  Carlill

continued to ask questions, but Agent Loose, who wanted Carlill to have his *Miranda* warnings read to him and the interview recorded, told him he need to take care of a few things before speaking to him.  TR at 23.

After speaking to and ascertaining the condition of the other four detained individuals, Agent Loose returned to interview Carlill in a large multi-use conference room.  TR at 24; Ex. 5 (photo of conference room).  Agent Loose was accompanied by Task Force Officer Samuel Walsh during the interview.  TR at 25.  Both Loose and Walsh were dressed in civilian clothes-- jeans and t-shirts -- and had their weapons and handcuffs concealed.  TR at 24-26, 52.  At approximately 9:30 or 10:00 p.m., Officer Walsh filled out a personal information sheet containing Carlill's name, date of birth, social security number, height, weight, and address.  TR at 49-51.  Agent Loose then commenced the interview, which was recorded, by confirming Carlill's biographical information and then asking if he understood and could read English.  TR at 28-29, 49; Ex. 2 (recording of interview); Ex. 3 (transcript of interview).  After getting a positive response, he placed a Statement of Rights form, on which he had written Carlill's name, date of birth, and social security number, in front of him.  TR at 28; Ex. 1 (Statement of Rights).  Carlill confirmed the biographical information on the Statement of Rights and Agent Loose then read him the statement of rights from the form.  TR at 28, 52.  He then asked Carlill to read and initial each right.  TR at 28-29.  Agent Loose then read Carlill the waiver that appears at the bottom of the Statement of Rights and told him that if he desired, he could elect to waive his rights and allow Loose to speak with him.  TR at 29. The waiver section of the Statement of Rights provides:

> I have had the above statement of my rights read and explained to me and I fully understand these rights. I waive them freely and voluntarily, without threat or intimidation and without any promise of rewards or immunity. I was taken into custody at ~1800 (time), on 31 May 15 (date), and have signed this document at 2218 (time), on 31 May 15 (date).

Ex. 1. After he reviewed the waiver, Carlill printed his name and signed. TR at 30; Ex. 1. Agent Loose and Officer Walsh then signed as witnesses. TR at 30-31; Ex. 1.

After obtaining the waiver, Agent Loose initiated the interview by noting that in his judgment Carlill was aware of his surroundings, was aware of what was going on, and was in good and sound state of mind. TR at 30-31; *see also* TR at 51-52 (Officer Walsh's similar impression). Despite mention by Carlill of the lack of medication for schizophrenia or bipolarism, at the commencement of the interview he appeared alert, aware, attentive and understanding. TR at 31-32, 38. Agent Loose did not ask Cargill if he was on medication at the time and did not question him about the medications any further. TR at 37-38. In the middle or end portion of the interview, Agent Loose believed the lack of medication "became more of an issue." TR at 32. However, any issues Carlill was having did not appear to impair his judgement, attention, or mental faculties. TR at 32. Toward the end of the interview, Carlill got to the point where he where he was falling asleep and his responses became slow. Agent Loose "allowed him time to gather himself, and eventually, he continued to answer [] questions." TR 32-33.

## B.    Defendant Carlill

On May 31, 2015, Carlill was driving a truck and towing a trailer as he approached the port of entry from Mexico into the United States. TR at 76. When he reached the booth at the port of entry, a female agent, who he thinks was Officer Keener,

asked him what he was doing in Mexico, where he was going, whether he had anything illegal, and other questions.  TR at 76.  Carlill told her that he had new ATVs and was coming from Rocky Point where he was "playing around with them."  TR at 76-77.  He also told them that, along with the ATVs, there was "a bunch of picnic stuff," a grill, and a propane tank in the trailer.  TR at 86.

Carlill was then sent to the secondary inspection area, where he was made to go inside a building that looked like a Greyhound Bus Station and "sit down with a bunch of other people."  TR at 77-78.  Later, they moved him to a smaller room (a little bigger than a witness box) that was concrete, with a metal toilet, sink and door, and a small window out of which he could not see.  TR 78.  He was in the small room for what seemed like three or four hours and, because he his claustrophobic, he was having trouble.  TR 79.  He was then taken to a third room, along with another individual, where he waited what "seemed like another at least three hours."  TR at 80.

Carlill first saw Agent Loose when he was in the third room.  The agent asked his name and asked if he was okay and if he needed a drink.  TR 80.  Carlill told him he was okay, but that he needed water.  TR at 81.  However, he did not get any water.  TR at 80.  When asked what else he and Agent Loose talked about, Carlill recalled:

> In that – while I was still in the concrete room, I don't – I don't think he asked me anything or I said anything, I think, at all.  It was that other room, the conference room or whatever, with the table.

TR at 81-82.  He asked Agent Loose why he was there, and the agent said that "[he] knew what [he] had done, [he] knew why [he] was there."  TR at 82.  To which Carlill responded he "had no clue what the hell he was talking about."  TR at 82.  Agent Loose

- 7 -

then asked Carlill to help him understand what was going on and, after Carlill again said

he didn't know, the agent told him that he "could wait for an attorney, or . . . talk to him

now, and he would be able to help . . . get done with it faster."  TR at 83.  Carlill recalls

that Agent Loose then returned to filling out paperwork and said something about waiting

for his partner.   TR at 84.

Eventually, Officer Walsh joined them in the interview room.  TR at 84.  Agent

Loose then read Carlill his *Miranda* rights and had him read them, as well.  TR at 84. At

the time, Carlill was supposed to be on medication, but he had not taken it for "[t]hree,

four days, a week, might have been two."  TR at 85.  Agent Loose then took Carlill's

statement.

## II.   CONCLUSIONS OF LAW

### A.   Motion to Suppress Post-Arrest Statement-Illegal Arrest

Carlill's argument is that he was arrested without probable cause, and he contends

that "[t]he best that the Government can hope to show . . . is that Mr. Carlill, like the

passenger, . . . was merely present at the time of the seizure."  (Doc. 14, p. 1.)  His mere

presence, he contends, is not enough to support an arrest.  In support of his argument,

Carlill offers the following quote containing examples of mere presence not constituting

probable cause for arrest:

> It is well settled that mere presence with known drug offenders is
> insufficient to give probable cause for an arrest. *See Sibron v. New York*,
> 392 U.S. 40, 62–63, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968) (police lacked
> probable cause to arrest a person found talking to narcotics addicts and
> traffickers); *Ybarra v. Illinois*, 444 U.S. 85, 94–96, 100 S.Ct. 338, 62
> L.Ed.2d 238 (1979) (police lacked probable cause to search bar patron
> when police had warrant to search tavern and bartender; no criminal

activity could be inferred from patron's mere presence in the bar). *See also United States v. Soyland*, 3 F.3d 1312, 1314 (9th Cir.1993) (police lacked probable cause to search automobile passenger when passenger was merely present in a car and driver admitted possession for personal use).

Doc. 14, p. 2 (quoting *United States v. Valencia-Amezcua*, 278 F.3d 901, 907 (9th Cir. 2002)).   Carlill's case, however is readily distinguished from *Sibron*, *Ybarra*, and *Soyland*.  As the driver of the vehicle, Carlill's role was more akin to that of the narcotics addicts in *Sibron*, the bartender in *Ybarra*, or the driver in *Soyland*.  Moreover, it was a reasonable inference that Carlill, as the driver of the truck and the owner of the trailer, had knowledge that illegal drugs were hidden in the trailer.  *United States v. Quintero-Barraza*, 78 F.3d 1344, 1351 (9th Cir. 1995).

Carlill's argument also entirely overlooks the law of search and seizure as it is applied on the border.  It has long been recognized that border searches constitute "a narrow exception to the Fourth Amendment prohibition against warrantless searches without probable cause."   *United States v. Sutter*, 340 F.3d 1022, 1025 (9th Cir.), *amended by* 348 F.3d 789 (2003).  "[M]ost border searches involving vehicles do not require any articulable level of suspicion."  *United States v. Bennett*, 363 F.3d 947, 951 (9th Cir. 2004).  The border includes the primary and secondary inspection areas.  *Sutter*, 340 F.3d at 1026-1027.   Under these authorities, it is abundantly clear that Officer Keener's initial interaction with Carlill and her subsequent referral for a secondary inspection was entirely appropriate.

Now, there is authority that requires reasonable suspicion for non-routine border searches.  *See, e.g.*, *United States Okafor*, 285 F.3d 842, 846 (9th Cir. 2002).  However,

this exception does not usually carry over to the intrusive search of a vehicle. *United States v. Flores-Montano*, 541 U.S. 149, 152-53 (2004) ("While it may be true that some searches of property are so destructive as to require a different result, this [disassembly of a vehicle's fuel tank] was not one of them."). Even if it did, at the time the agents physically inspected the trailer's hidden compartment, they already had reasonable suspicion of the presence of contraband based on the K-9, X-Ray and density meter inspections. The latter searches required no particularized suspicion. *See, e.g.*, *Okafor*, 285 F.3d at 846 (examination by X-ray); *United States v. Camacho*, 368 F.3d 1182, 1184-85 (9th Cir. 2004) (border search of vehicle's tire with density gauge). Once the agents had the information provided by these non-intrusive means, they clearly had the reasonable suspicion to conduct the more intrusive search.

Carlill's detention during the secondary search also did not violate the Fourth Amendment. *United States v. Carranza*, 289 F.3d 634, 640 (9th Cir. 2002). This is so even if he was handcuffed. *United States v. Bravo*, 295 F.3d 1002, 1006 (9th Cir. 2002).

Returning to Carlill's contention that probable cause did not exist for his arrest, it is the Government's burden to prove that at the moment of arrest "the facts and circumstances within the knowledge of the arresting officers and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [defendant] had committed or was committing an offense." *United States v. McCarty*, 648 F.3d 820, 838-39 (9th Cir. 2011). Because the Court has concluded that the marijuana was legally discovered, Carlill's mere presence argument is squarely foreclosed. In *United States v. Buckner*, 179 F.3d 834 (9th Cir. 1999), Kendra Murry was

a passenger in a car entering the United States from Mexico that was found to contain thirty-seven pounds of marijuana hidden in the dashboard and rear panels.  *Id*. at 837.  Neither the driver nor Murry was the owner of the car, which the driver had picked up a few hours before in Mexico.  *Id*.  Based on those facts, the district court concluded, relying on *United States v. Soyland*, 3 F.3d 1312, that probable cause did not exist for Murry's arrest.  *Id*.  On appeal, the Ninth Circuit reversed the decision of the district court and explained the case was more like that addressed by the court in *United States v. Heiden*, 508 F.2d 898 (9th Cir. 1974).  There, Border Patrol agents, suspecting to find illegal aliens, stopped a car in which Heiden was the sole passenger and discovered 110 pounds of marijuana in the trunk.  *Id.* at 901-02.  The agents arrested both the driver and Heiden, and Heiden subsequently claimed that the agents lacked probable cause to arrest him.  *Id.* at 901.  The Ninth Circuit stated that the arresting agents "reasonably believed that [Heiden] was involved the transporting of marijuana.  The officers were not required to believe his explanation that he did not know about the marijuana."  *Id*.

Carlill's situation presents an even stronger case for finding agents had probable cause for his arrest.  Unlike Heiden, Carlill was not a mere passenger, but was the driver of the truck and the owner of both the truck and the trailer.  These facts, particularly when coupled with Carlill's short visit to Mexico and fidgety behavior, support his arrest "as a probable party to the importation."  *Bettis v. United States*, 408 F.2d 563, 567 (9th Cir. 1969); *see also United States v. Hernandez*, 322 F.3d 592, 599 (9th Cir. 2003).  Simply put, the totality of the circumstances of this case support a finding of probable cause because "knowledge may be reasonably inferred where the defendant drives a car

'laden' with illegal substances." *United States v. Quintero-Barraza*, 78 F.3d 1344, 1347 (9th Cir. 1995).  Accordingly, there was no illegal arrest and Carlill's post-arrest statement is not subject to suppression on that basis.

### B.    Motion to Suppress Post-Arrest Statement-Involuntariness

As a threshold matter, Carlill urges the Court to follow the Supreme Court's decision in *Bram v. United States*, 168 U.S. 532 (1897), and find his statement involuntary if it was the product of any "direct or implied promises, however slight." Doc. 13, p. 3.  As the Government contends, however, these remarks from *Bram* do not represent the present state of the law.  The Supreme Court specifically disavowed the language cited by Carlill in *Arizona v. Fulminante*, 499 U.S. 279 (1991), and ruled that "under current precedent [that dictum] does not state the standard for determining the voluntariness of a confession." *Id*. at 285; *see also United States v. Long*, 852 F.2d 975, 980 (7th Cir. 1988) (Easterbrook J., concurring) ("*Bram* has not excluded a confession in decades; it is a derelict offering false hope to suspects and vexing judges who must distinguish it on the way to decisions reached on other grounds.  It is a source of pointless litigation . . . .").

Under today's standard, the government must prove voluntariness of a statement by a preponderance of the evidence.  *United States v. Benitez*, 34 F.3d 1489, 1495 (9th Cir. 1994).  The voluntariness of a post-*Miranda* statement is analyzed in light of its independent surrounding circumstances.  *Oregon v. Elstad,* 470 U.S. 298, 318 (1985). "In evaluating voluntariness, the test is whether, considering the totality of the circumstances, the government obtained the statement by physical or psychological

coercion or by improper inducement so that the suspect's will was overborne." *United States v. Male Juvenile,* 280 F.3d 1008, 1022 (9th Cir.2002) (citation and internal quotation marks omitted); *see also Clark v. Murphy,* 331 F.3d 1062, 1072 (9th Cir.2003). The totality of the circumstances include: the crucial element of police coercion; the length of the interrogation; its location; its continuity; the defendant's maturity; education; physical condition; and mental health. *Taylor v. Maddox*, 366 F.3d 992, 1016 (9th Cir. 2004). Psychological coercion is equally likely to result in involuntary statements and is just as forbidden as violent or physical interrogation tactics. *Collazo v. Estelle*, 940 F.2d 411, 416 (9th Cir. 1991).  It is under these standards that Carlill's statement must be examined.

In his motion, Carlill argues that his statement was not voluntarily made because agents told him, "You can either talk to me now or you can have an attorney.  If you talk to me now, I can help you out."  Doc. 13, p. 1.  At the hearing, Carlill testified that Agent Loose, before starting the recorder and before giving him *Miranda* warnings, stated that Carlill "could wait for an attorney, or . . . talk to him now, and he would be able to help . . . . get done with it faster."  TR at 83.  He also testified that, "I was told that, if I talked to him now, he would be able to let me get out of here faster, or get done with it [i.e., the interview] faster.  TR at 109.  Even if events transpired as Carlill claims, the Ninth Circuit has made it clear that statements by law enforcement indicating that cooperation might help a defendant "are not improper and do not render a suspect's statements involuntary unless under the total circumstances it is plain that they have overborne the free will of the suspect."  *Okafor*, 285 F.3d at 847; *see also United States v. Leon*

*Guerrero*, 847 f.2d 1363, 1366 (9th Cir. 1988).   Moreover, the remainder of the record establishes that his statement was provided after he was given his *Miranda* warnings and was voluntary.

Here, the total circumstances were that Carlill had waited for some time in at least one holding cell before he was questioned.   However, there is no dispute that he was questioned in a multi-use room that had comfortable chairs.   Carlill stated that he was not claustrophobic in the interview room.   TR at 102.   He agrees that he read and initialed his rights on the Statement of Rights form and that he waived them after Agent Loose confirmed that he understood them.   TR at 97-101.   He agreed that he spoke freely to Agent Loose. TR at 99.   Carlill was under a great deal of stress, but when asked if the statement he provided to Agent Loose was made of his own free will, he responded, "Yeah."   TR at 108-09.   Carlill agrees that he was not promised that he would not be prosecuted, would not see a judge, or that he would get less jail time.   TR at 109.

Because the duration or conditions of the interview do not support a finding of involuntariness, the Court's only remaining concern is Carlill's overall mental condition at the time of his arrest and statement.   As the Ninth Circuit has explained, as interrogators have moved "away from physical coercion, courts have found the mental condition of the defendant a more significant factor in the 'voluntariness' calculus." *United States v. Preston*, 751 F.3d 1008, 1023 (9th Cir. 2014) (en banc).   Here, Carlill testified that he had not had his medication for some time and that he suffered from schizophrenia and a bipolar disorder.   It is of some concern that the agents did not follow-up on this information by inquiring more into Carlill's mental state.   This concern is

lessened by the agents' testimony that, at least at the commencement of the interview he appeared alert, aware, attentive and understanding.   TR at 31-32, 38.   Agent Loose indicated that in the middle or end portion of the interview, the lack of medication "became more of an issue," and toward the end of the interview, Carlill got to the point where he where he was falling asleep and his responses became slow.   Ultimately, however, a review of the record reflects that Carlill's responses, even at the end of the interview, were coherent and, at times, of some length.   Thus, on this record, the Court finds that Carlill's will was not overborne and that his statement to Agent Loose was voluntary.

## III.      RECOMMENDATION FOR DISPOSITION BY THE DISTRICT JUDGE

Based on the foregoing, the Magistrate Judge recommends that the District Court, after an independent review of the record, DENY Defendant's Motion to Suppress Post-Arrest Statement-Involuntariness (Doc. 13) and a Motion to Suppress Post-Arrest Statement-Illegal Arrest (Doc. 14).

This Recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals.   Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the District Court's judgment. However, the parties shall have fourteen (14) days from the date of service of a copy of this recommendation within which to file specific written objections with the District Court. *See* 28 U.S.C. § 636(b)(1) and Rules 72(b), 6(a) and 6(e) of the Federal Rules of Civil Procedure. Thereafter, the parties have fourteen (14) days within which to file a response to the objections. No replies are permitted without leave of court.   If any

objections are filed, this action should be designated case number: **CR 15-1161-TUC-CKJ.**   Failure to timely file objections to any factual or legal determination of the Magistrate Judge may be considered a waiver of a party's right to de novo consideration of the issues.  *See United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003) (en banc).

Dated this 18th day of December, 2015.

Jacqueline M. Rateau
United States Magistrate Judge